# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CYNTHIA MCCONAUGHY,    Case No. 1:08-cv-320
   Plaintiff       Weber, J.
             Hogan, M.J.

 vs

UNIVERSITY OF CINCINNATI, et al.,  **REPORT AND RECOMMENDATION**
   Defendants

   Plaintiff Cynthia McConaughy brings this action against the University of Cincinnati,

Professor Henry Hildebrandt, and Ombudsman Lillian Santa-Maria[1] alleging discrimination on

the basis of sex in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681,

et seq. This matter is before the Court on defendants' motion for summary judgment (Doc. 46),

plaintiff's memorandum in opposition (Doc. 51), and defendants' reply memorandum. (Doc. 53).

   A motion for summary judgment should be granted if the evidence submitted to the court

demonstrates that there is no genuine issue as to any material fact and that the movant is entitled

to summary judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving

party must demonstrate the absence of genuine disputes over facts which, under the substantive

law governing the issue, could affect the outcome of the action. *Celotex Corp.*, 477 U.S. at 323.

   In response to a properly supported summary judgment motion, the non-moving party "'is

required to present some significant probative evidence which makes it necessary to resolve the

---

[1]Plaintiff also names as defendants the University of Cincinnati College of Design, Architecture, Art and Planning ("DAAP") and its School of Architecture and Interior Design ("SAID"). Defendants represent that those programs have no separate legal identity apart from the University of Cincinnati. (Doc. 46 at 1, n.1). Plaintiff has not disputed this assertion. Therefore, the Court's rulings as to defendant University of Cincinnati applies equally to defendants DAAP and SAID.

parties' differing versions of the dispute at trial.'" *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989) (quoting *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Satterfield v. Tennessee,* 295 F.3d 611, 615 (6th Cir. 2002); *Little Caesar Enterprises, Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a prima facie case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*). A principal purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex,* 477 U.S. at 323-24. The moving party need not support its motion with evidence disproving the opposing party's claims. Rather, the moving party need only point out there is an absence of evidence supporting such claims. *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996) (citing *Celotex Corp.,* 477 U.S. at 325). Nor must the Court search the entire record for material issues of fact. *Street*, 886 F.2d at 1479-80. The court need only determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## I. Facts

The following facts are not in dispute:[2]

1. Plaintiff Cynthia McConaughy first enrolled at the University of Cincinnati ("the University") in 1983. (Doc. 46, Pl. Dep. 56)

2. In 1998, McConaughy entered the University's College of Design, Architecture, Art, and Planning ("DAAP"). (Pl. Dep. 85)

3. DAAP is well-known to be one of the most challenging programs of study at the University and one of the most competitive design programs in the country. (Compl., Doc. 5, ¶¶ 2-3)

4. McConaughy often withdrew from classes and also failed several classes. (Pl. Dep. 92-95)

5. The DAAP curriculum culminates with a Senior Studio course in which interior design students are required to prepare and present a final design project.

6. At mid-term and again at finals, students are required to "pin up" their project for critique by members of DAAP's faculty. (Pl. Dep. 147)

7. The project includes a model, various drawings and elevations, a site plan, an image board, and other components. (Pl. Dep. 294-95)

8. McConaughy took the Senior Studio course for the first time in the 2003-2004 Spring quarter. (Pl. Dep. 109)

9. At that time, the course was taught by defendant Henry Hildebrandt and Professor Ann Black. (Pl. Dep. Ex. 6)

10. Students' grades in Senior Studio are based not just on what they produce, but on the overall process and "how they develop their work throughout the quarter." (Hildebrandt Dep. 33)

11. In a May 24, 2004 letter, Hildebrandt and Black advised McConaughy that her project was "not up to the level of development and resolution as it should be at this time in the quarter." (Pl. Dep. Ex. 6)

12. Based on their understanding that McConaughy's doctor was ordering her to remain on bedrest due to McConaughy's pregranancy, the letter said that McConaughy would be permitted

---

[2]With three exceptions which are noted at ¶¶53-55, the facts are taken largely from defendants' proposed findings of fact which plaintiff has not disputed.

3

to complete her Senior Studio work "by the last class day of Summer Quarter, Friday, August 27, 2004, unless a medical condition warrants a different end date," so that she could focus on her health. (Pl. Dep. Ex. 6)

13. The University did not hold McConaughy to the August 2004 extension date. (Pl. Dep. 112)

14. McConaughy then planned to take until the Spring 2005 quarter to complete her Senior Studio project. (Pl. Dep. 113)

15. In November 2004, McConaughy–who had not yet finished her Senior Studio project–contacted Professor Black about completing her graduation requirements. (Pl. Dep. 154-56)

16. Professor Black responded in an e-mail to McConaughy and Hildebrandt that McConaughy should "maybe take the [Environmental Technology] final during finals week and then work on her project (maybe we want to meet with her during finals week or the last week of classes) so she can work on her project over the break and present the final project early in January [2005]." (Pl. Dep. Ex. 8)

17. Among other assistance, Professor Black also sent an e-mail to the Hamilton County Department of Job and Family Services to help McConaughy arrange childcare so that she could focus on her course work. (*Id.*; Pl. Dep. 111, 157)

18. McConaughy did not complete the project for review in January 2005. (Pl. Dep. 155-56)

19. McConaughy testified she still needed three to four weeks of course instruction and thought she would take the Senior Studio course "the next time around in '05" because the Studio course was only offered once per year. (Pl. Dep. 155-56)

20. During the Spring quarter in 2005, after McConaughy had apparently continued to work on her Senior Studio project, McConaughy and Professor Black agreed that McConaughy would present her project on May 16, 2005. (Pl. Dep. Ex. 9)

21. At 5:56 a.m. on the agreed-upon date, McConaughy sent an e-mail to Professor Black admitting that her project was still "not all the way finished" and that her project was "still under-developed in comparison to those in Sr. Studio at this time." (Pl. Dep. Ex. 9)

22. McConaughy went on to note in her e-mail that even had she completed the work she would not have presented it anyway because her car was in the shop. (Pl. Dep. Ex. 9; Pl. Dep. 181-82)

23. McConaughy withdrew from the Senior Studio course that quarter. (Pl. Dep. 94)

24. In July 2005, McConaughy was placed on academic probation due to her low grades. (Pl. Dep. Ex. 10)

4

25. It was the second time the University had placed her on probation. (Pl. Dep. Ex. 10)

26. After withdrawing from Senior Studio, McConaughy met with another DAAP professor, Patrick Snadon. (Pl. Dep. 94, 191; Ex. 11 at 2-3)

27. Professor Snadon also offered McConaughy more time to finish her Senior Studio project and present it during the summer of 2005. (Pl. Dep. Ex. 11 at 2-3)

28. In November 2005, McConaughy contacted Professor Snadon to advise him she had been unable to meet the requirements outlined at their meeting. (Pl. Dep. Ex. 11 at 2-3)

29. In a November 10, 2005 e-mail to Professor Snadon, McConaughy referred to childcare problems that she had supposedly resolved, and asked for a "final opportunity" and acknowledged her understanding that "no other opportunities will be granted" to her. (Pl. Dep. Ex. 11 at 3)

30. In December 2005, Ann Black and others from the DAAP faculty met with McConaughy to see how she might be able to finish her degree. (Pl. Dep. 199; Ex. 11)

31. The University allowed her to enroll in the Senior Studio course for a third time in the Spring of 2006 and assisted with financial arrangements for her to take that course and one other she needed for graduation. (Pl. Dep. 206, 208, 222-23; Ex. 14)

32. In a March 3, 2006 e-mail to Professor Black, McConaughy acknowledged that her Senior Studio project "is simply not at all where it needs to be." (Pl. Dep. Ex. 14)

33. McConaughy received a grade of D on her third week review and a D+ for her fifth week review. (Pl. Dep. 224; Ex. 16)

34. McConaughy's professors' evaluation the following month was that McConaughy's work was "confusing" and "incomplete as is." (Pl. Dep. 224; Ex. 16)

35. On May 10, 2006, McConaughy – still on academic probation – was scheduled to present her work at the seventh-week final design review. (Pl. Dep. 233)

36. At that time, McConaughy experienced a miscarriage. (Pl. Dep. 233)

37. McConaughy had never disclosed her pregnancy to the University. (Pl. Dep. 218-19)

38. At the time just prior to the miscarriage, McConaughy's progress in her Senior Studio work was worse than it had been during her unsuccessful 2004 attempt to finish the class. (Pl. Dep. 219).

39. McConaughy testified: "At the time of the miscarriage, it was lower than it was in '04,

5

but it was improving and it wasn't failing." (Pl. Dep. 219). She admitted she had been give grades of D along the way. (Pl. Dep. 219-20)

40. On May 19, 2006, a nurse sent the University a note asking that McConaughy's absence from classes between May 6 and May 18 be excused because McConaughy "needed time to grieve." (Pl. Dep. Ex. 18)

41. Two days prior to the date on that nurse's note, McConaughy's professors had sent her a letter about her status in Senior Studio. (Pl. Dep. Ex. 17)

42. The professors expressed concern about the work that remained to be done on the project at McConaughy's last review, problems with her graphic communications work, and her poor attendance in the course. (Pl. Dep. Ex. 17)

43. They advised her to make an appointment with Michaele Pride-Wells, Director of the Interior Design Program, and Professor Black regarding McConaughy's future at the University. (Pl. Dep. Ex. 17)

44. After meeting with Professor Black, McConaughy was given more time – until June 5, 2006 – to present her Senior Studio project. (Pl. Dep. 257-58)

45. Although she had loaded the project in her car, she chose not to present her work for review that day. (*Id*. at 258; Ex. 22)

46. Several hours later, McConaughy's professors told her she would be receiving an F for the Senior Studio course. (Pl. Dep. Ex. 22)

47. The next morning, however, the same professors agreed to give McConaughy one more chance. (Pl. Dep. Ex. 21)

48. Defendant Hildebrandt sent her an e-mail stating that he and Professor Kristie Pudlock would submit an "Incomplete" grade for McConaughy and would give her until June 19 to present her Senior Studio project. (Pl. Dep. Ex. 21)

49. McConaughy responded to express her appreciation for the additional time: "Thank you for changing your mind." (Pl. Dep. Ex. 21)

50. When the agreed-upon June 19 date came, McConaughy presented a project that she acknowledges was not complete and that the presentation material was underdeveloped. (Pl. Dep. 261; Ex. 21, 23)

51. While her professors concluded that she had earned an F for the Senior Studio course, they nonetheless encouraged her to complete the project with the intention of presenting it "for a pin up review in the near future after the work is finished." (Pl. Dep. Ex. 23)

6

52.  Michaele Pride-Wells, Director of the Interior Design Program, also encouraged McConaughy in June 2006 to finish the project and request a review when it was completed. (Pl. Dep. 264-65)

53.  McConaughy testified that she was denied feedback on her project, a benefit other students in the program were given. (Pl. Dep. 293-94).

54.  McConaughy testified that without feedback, she had no way of knowing whether her project was ever in a completed stage to present. (Pl. Dep. 293-94).

55.  McConaughy was also required to remove the project from the school.  The model that was made from heavy MDF board was disassembled and removed from the school, at the University's request, causing damage to the project. (Pl. Dep. 297-298).

56.  McConaughy did not contact Pride-Wells until November 2006. (Pl. Dep. Ex. 28 at 1-2)

57.  In an e-mail to Pride-Wells, McConaughy expressed "remorse . . . for failing to finish my degree," and she asked: "May I please show you that I can still produce quality work similar to what I was capable of producing prior to my Senior Year?" (Pl. Dep. Ex. 28 at 2)

58.  The May 2006 miscarriage was one item McConaughy mentioned among other "life-altering circumstances" that she listed for Pride-Wells to explain her inability to complete her Senior Studio project. (Pl. Dep. Ex. 28 at 2)

59.  As of November 2006, McConaughy had not finished her Senior Studio project. (Pl. Dep. 293)

60.  In response, Pride-Wells advised McConaughy to contact Dean Amberly Miller for further assistance. (Pl. Dep. Ex. 28 at 1)

61.  McConaughy spoke with Dean Miller about her suspension from the University, which was effective September 2006 and was issued to McConaughy based on her grades. (Pl. Dep. 287, Ex. 24, 25)

62.  Despite being under suspension, McConaughy never applied for readmission. (Pl. Dep. 287-88)

63.  In March 2007, McConaughy, through counsel, filed a grievance with the University.  She alleged that the University's failure to grant her leave following her miscarriage in the Spring of 2006 constituted pregnancy discrimination. (Pl. Dep. 240; Ex. 19)

64.  The grievance asked "to have the probation and suspension removed." (Pl. Dep. Ex. 19)

65.  McConaughy also requested that the University use an external reviewer to evaluate her Senior Studio project. (Pl. Dep. 346)

66.  The University had its Provost, Dr. Karen Faaborg, investigate the grievance and meet with McConaughy and her attorney. (Pl. Dep. Ex. 29)

67.  Dr. Faaborg ultimately concluded that McConaughy had never requested a medical leave.  In a letter dated July 30, 2007, Dr. Faaborg wrote: "The College did have a request from you for an extension on the time period for presentation of the Senior Project which they honored.  But at no time did you indicate to them that a medical leave was needed." (Pl. Dep. Ex. 29)

68.  McConaughy had not provided the University with documentation about how much time she needed to take after the miscarriage. (Pl. Dep. 251, 325)

69.  McConaughy herself had not discussed the issue of medical leave with her health care providers in 2006. (Pl. Dep. 326)

70.  All she submitted in 2006 was documentation about the pregnancy itself, the fact of the miscarriage, and the nurse's note saying McConaughy had "needed time to grieve" until May 18, 2006. (Pl. Dep. 251-53; Ex. 18)

71.  In connection with McConaughy's 2004 pregnancy, in contrast, she had provided Professor Ann Black with a doctor's written recommendation of bedrest when the University granted her more time to complete her Senior Studio work. (Pl. Dep. 142-43)

72.  After McConaughy's lawyer filed the 2007 grievance, the University agreed provide McConaughy with another opportunity to present her Senior Project and have it adjudicated by outside reviewers. (Pl. Dep. 327; Ex. 29)

73.  McConaughy then had from July to December to complete her project.

74.  The University advised her that she could use the University's library and Computer Graphics Center to do the work. (Pl. Dep. Ex. 31 at 2)

75.  McConaughy also had access to the work she had previously completed and stored on the University's computer server. (Pl. Dep. Ex. 31 at 2)

76.  From five dates that were offered to her, McConaughy chose to present her project on December 3, 2007. (Pl. Dep. 346-47; Ex. 31 at 1-2)

77.  In satisfaction of McConaughy's request for an external reviewer, the University arranged for John Weigand, Chair and Professor of Architecture and Interior Design at Miami University, to evaluate the project. (Pl. Dep. 346-47; Ex. 31 at 1-2)

8

78. The University told McConaughy that Professor Hildebrandt agreed to accept whatever grade was awarded by Dr. Weigand. (Pl. Dep. 346-47; Ex. 31 at 1-2)

79. McConaughy did not show up to present her Senior Studio project on the designated date. (Pl. Dep. 351)

80. Dr. Weigand, as well as McConaughy's own attorney, made the unnecessary trip to DAAP. (Pl. Dep. 353; Ex. 31)

81. At her deposition, McConaughy offered the following explanation for why she failed to appear: "I was just absolutely afraid to show this project when it was an all-or-nothing deal and they said you had to get an A. . . . I was–had every intention to show up and everything just–things didn't start going–things just didn't go right for me. My project didn't fit in this rental car that I had and it – I just began to panic." (Pl. Dep. 352)

82. On December 12, 2007, Dr. Faaborg wrote an e-mail to McConaughy stating that the University could provide no further opportunities for McConaughy to finish the Senior Studio course. (Pl. Dep. Ex. 31)

83. Dr. Faaborg included contact information in the e-mail for the University's Center for Exploratory Studies so that McConaughy could determine whether she was eligible for another degree based on her previous course work. (Pl. Dep. Ex. 31)

84. On May 7, 2008, McConaughy filed the instant lawsuit. (Doc. 5).

**II. Defendants' motion for summary judgment should be granted on plaintiff's claims against defendants Hank Hildebrandt and Lillian Santa-Maria.**

Plaintiff's complaint alleges claims of retaliation and negligence against defendants Hank Hildebrandt and Lillian Santa-Maria. (Doc. 5, ¶¶45-55). Defendants seek summary judgment on these claims. (Doc. 46 at 17-19). However, plaintiff has failed to respond to or dispute defendants' motion in this regard. Since it appears that plaintiff has abandoned these claims or otherwise failed to respond and create a genuine issue of material fact necessitating a trial on these claims, *see Abdulsalaam v. Franklin County Bd. of Commissioners*, 637 F. Supp.2d 561, 578 (S.D. Ohio 2009); *Dage v. Time Warner Cable*, 395 F. Supp.2d 668, 679 (S.D. Ohio 2005); *Bradley v. Mary Rutan Hosp. Assoc.*, 322 F. Supp.2d 926, 932 n.7 (S.D. Ohio 2004), summary

judgment should be granted for defendants on plaintiff's retaliation and negligence claims against defendants Hank Hildebrandt and Lillian Santa-Maria claim.

### III. Defendants' motion for summary judgment on plaintiff's Title IX discrimination claim should be granted.

Title IX of the Education Amendments of 1972 prohibits sex discrimination in any educational program or activity receiving federal financial assistance. Title IX provides in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). Regulations promulgated under Title IX apply its prohibition against sex discrimination to discrimination on the basis of pregnancy and parental status, stating:

> A recipient shall not apply any rule concerning a student's actual or potential parental, family, or marital status which treats students differently on the basis of sex.

34 C.F.R. § 106.40(a). The regulations further provide:

> (b) Pregnancy and related conditions. (1) A recipient shall not discriminate against any student, or exclude any student from its education program or activity, including any class or extracurricular activity, on the basis of such student's pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery therefrom, unless the student requests voluntarily to participate in a separate portion of the program or activity of the recipient.

34 C.F.R. § 106.40(b).

Plaintiff claims she was discriminated against on the basis of her sex in violation of Title IX when defendants denied her the opportunity to graduate from the DAAP program following her miscarriage in 2006. (Doc. 51 at 1). In assessing plaintiff's Title IX claim, the Court applies the burden-shifting framework utilized in Title VII claims. *See Nelson v. Christian Bros. Univ.*,

226 Fed. Appx. 448, 454 (6th Cir. 2007); *Arceneaux v. Vanderbilt University*, 25 Fed. Appx.

345, 347 (6th Cir. 2001). *See also Finch v. Xavier University,* 689 F. Supp.2d 955, 965 (S.D.

Ohio 2010). In the context of a claim involving discriminatory treatment based on pregnancy,

the parties agree that plaintiff must first establish a *prima facie* case of discrimination by

showing: (1) she was a member of a protected class; (2) she was performing the academic

requirements at a level well enough to meet her educator's legitimate expectations; (3) she

suffered adverse treatment; and (4) the educational program continued to instruct and credit other

students. (Doc. 46 at 12; Doc. 51 at 1, citing *Darian v. University of Massachusetts Boston*, 980

F. Supp. 77, 91 (D. Mass. 1997)). *See also Hogan v. Ogden*, No. CV-06-5078-EFS, 2008 WL

2954245, at *9 (E.D. Wash. July 30, 2008).

   Once plaintiff has presented evidence sufficient to establish a *prima facie* case of

discrimination, the burden of production shifts to defendants to articulate a legitimate, non-

discriminatory reason for its adverse treatment. *Id. See also Texas Dept. of Community Affairs v.*

*Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802

(1973). If defendants meet this burden, the burden of production shifts back to plaintiff to

demonstrate that defendants' articulated reason is merely a pretext for unlawful discrimination.

*Burdine,* 450 U.S. at 253; *McDonnell Douglas Corp.*, 411 U.S. at 804. In other words, plaintiff

must show that the proffered explanation is unworthy of credence or that defendants were more

likely motivated by a discriminatory reason. *Manzer v. Diamond Shamrock Chemicals Co.*, 29

F.3d 1078, 1082 (6th Cir. 1994). There must be "a sufficient basis *in the evidence*" for rejecting

an employer's stated explanation for its action. *Manzer*, 29 F.3d at 1083 (emphasis in the

original). *See also Gray v. Toshiba*, 263 F.3d 595, 600 (6th Cir. 2001). Summary judgment in

favor of defendants is appropriate where plaintiff is unable to demonstrate pretext sufficient to rebut defendants' legitimate, non-discriminatory reasons. *Barnhart v. Peckrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1395 (6th Cir. 1993).

As an initial matter, the Court notes that it is undisputed the University did not know plaintiff was pregnant prior to her pregnancy loss in May 2006.  Therefore, the University could not have discriminated against her on the basis of her pregnancy prior to that date.

With respect to the circumstantial showing of discrimination, plaintiff satisfies the first and fourth elements of her *prima facie* case because it is undisputed that she was pregnant and suffered a miscarriage that the University continued to instruct and credit other students in the Senior Studio program during the Spring 2006 quarter.  Plaintiff alleges she was denied "the opportunity to stay in the program" and to receive "continued feedback on the project," a benefit other students were given and she was not. (Doc. 51 at 3).  Even assuming this constitutes adverse treatment under the third element of her *prima facie* case, plaintiff nevertheless fails to meet the second element of her *prima facie* case, *i.e.*, that her performance in the Senior Studio class met the University's legitimate expectations.

Plaintiff fails to present evidence creating a genuine issue of fact that she was not meeting the legitimate academic requirements of the Senior Studio program prior to her May 2006 miscarriage.  Students in the Senior Studio program are evaluated on their work product, the development of their work throughout the quarter, and the overall process involved in creating their projects. (Hildebrandt Dep. 33).  When plaintiff enrolled in the Senior Studio class in the Spring of 2006, she was still on academic probation from July 2005. (Pl. Dep. Ex. 10).  Plaintiff, by her own admission, acknowledged that her work in the Spring of 2006 was worse than her work in 2004 when she first enrolled in Senior Studio. (Pl. Dep. 219-20).   The evidence shows

12

that plaintiff missed classes, received grades of D, and had work product that her professors deemed incomplete and "confusing." (Pl. Dep. 224; Ex. 16). In May 2006, plaintiff's professors advised her "that given the state of your work to date you have a failing senior project. This is due to the many unresolved issues we have noted according to the midterm review of April 28, your continual lack of attendance in studio, the lack of a cohesive graphic communication package, and not being able to present your work for the critical final design review during last week's seventh week review." Even disregarding plaintiff's inability to present her project for the seventh week review, which resulted from the unexpected pregnancy loss, the issues noted by her professors show the state of her work pre-miscarriage did not meet the legitimate expectations of the University for the Senior Studio class.

Plaintiff characterizes the award of a grade of D+ in the fifth week of the term after a grade of D in the third week as "improvement" and argues there is no evidence that this improvement would not continue had the University accommodated her pregnancy loss. (Doc. 51 at 3). However, the undisputed evidence shows that in addition to almost failing grades, her work product was incomplete and confusing, she was on academic probation, and, by her own admission, her work was not up to the academic standards of the program. To assume that plaintiff would continue to "improve" as plaintiff suggests would require the Court to engage in speculation. The burden of proof is on plaintiff to establish she was meeting the legitimate academic expectations of the program. She has not done so and fails to present evidence establishing this prong of her *prima facie* case.

Plaintiff's complaint also suggests that before experiencing difficulties in her personal life beginning in the Spring of 2003, she was performing well academically and this performance

13

should be taken into consideration. Yet, the issue for this Court is whether plaintiff was discriminated against on the basis of her pregnancy loss which occurred in May 2006. Thus, the Court's focus must be on the time frame surrounding plaintiff's pregnancy loss, any alleged adverse treatment by the University at that time, and the likely reasons for the University's action. The *prima facie* case is one way for a plaintiff to make a circumstantial showing that any adverse treatment she experienced was more likely than not a result of unlawful discrimination. But, where the facts show that a student is not meeting the academic requirements for the course of study to which she is attending prior to the alleged adverse treatment, the Court may not draw a reasonable inference that the adverse treatment was based on unlawful discrimination because it is more likely than not that the failure to meet the legitimate expectations of the University was the reason for the adverse treatment. Thus, plaintiff's academic performance prior to the Spring of 2003 is not relevant to whether she was meeting the legitimate academic expectations of the University in the Spring of 2006.

Subsequent to the pregnancy loss, plaintiff was given multiple opportunities to complete and present her Senior Studio project to department faculty for review and evaluation in an effort to finish her degree. Plaintiff was initially given until June 5, 2006 to present her Senior Studio project. (Pl. Dep. 257-58). When the date arrived, she chose not to present her work (*Id*. at 258; Ex. 22) and was advised by her professors she would receive an F for the Senior Studio course. (Pl. Dep. Ex. 22). The following day, however, her professors agreed to give her another chance. They changed her grade to "Incomplete" and scheduled a review of the project on June 19, 2006. On that date, plaintiff presented a project that she acknowledged was incomplete. She also acknowledged that the presentation material was underdeveloped. (Pl. Dep. 261; Ex. 21, 23).

Plaintiff received a grade of F for the course, but was encouraged by her professors and the

Director of the Interior Design Program to complete the project with the intention of presenting it

"for a pin up review in the near future after the work is finished." (Pl. Dep. Ex. 23; Pl. Dep. 264-

65).

        In November 2006, plaintiff contacted the Director of the Interior Design Program to

request another opportunity to present her project. (Pl. Dep. Ex. 28 at 1-2).  Plaintiff was advised

to speak with Dean Amberly Miller for further assistance. (Pl. Dep. Ex. 28 at 1).  While plaintiff

spoke with Dean Miller about her suspension, effective September 2006 (Pl. Dep. 287, Ex. 24,

25), she did not apply for readmission to the University. (Pl. Dep. 287-88).

        Following plaintiff's March 2007 grievance (Pl. Dep. 240; Ex. 19), the University agreed

provide plaintiff with another opportunity to present her Senior Project and have it adjudicated by

outside reviewers. (Pl. Dep. 327; Ex. 29).  Plaintiff then had from July to December to complete

her project and was allowed use of the University's library and Computer Graphics Center to do

the work. (Pl. Dep. Ex. 31 at 2).  On the December 2007 date selected by plaintiff for review of

the project, plaintiff failed to show up to present her Senior Studio project and later testified that

she panicked and was afraid to show the project. (Pl. Dep. 351-52).  The University then

concluded it could provide plaintiff with no further opportunities to finish the Senior Studio

course. (Pl. Dep. Ex. 31).

        The undisputed evidence presented establishes that the University gave plaintiff a number

of opportunities to complete the Senior Studio class by presenting her finished project for

evaluation by both University professors and an independent evaluator.  However, plaintiff failed

to present a completed project and to show up at the appointed date and time to present her

project. These opportunities, coupled with the academic evaluations presented, establish that plaintiff was not meeting the legitimate academic expectations of the University.

Plaintiff argues that she should not be faulted for not meeting the legitimate expectations of the Senior Studio program when the University denied her feedback on her project–a benefit other students in the program were given–to know whether her project was ever in a completed stage to present. (Doc. 51 at 4). The Court has carefully reviewed the admissible evidence presented on the motion for summary judgment and does not see any evidence that the feedback issue was raised by plaintiff to the University as a necessary prerequisite to the presentation of her project.[3] In any event, after plaintiff failed to present her project on the June 5, 2006 extension date, she met with Professor Hildebrandt in his office for more than two hours. (Doc. 46, Pl. Dep. Ex. 22). She was then given another opportunity to present her work on June 19, 2006. When reviewed on that date, her project was not complete and the presentation material was underdeveloped. (Pl. Dep. 261; Ex. 21, 23). Professor Hildebrandt's email of June 19, 2006 noted in detail the shortcomings of plaintiff's work. (Pl. Dep. Ex. 23). While plaintiff received a grade of F for the course, she was encouraged by her professors and the Director of the Interior Design Program to complete the project with the intention of presenting it "for a pin up review in the near future after the work is finished." (Pl. Dep. Ex. 23). As explained above, despite the opportunity for yet another review by an independent evaluator on a date selected by plaintiff in

---

[3]Plaintiff also contends she was denied the opportunity given to other students of keeping her project at the university and not risking damage or destruction by moving it. Plaintiff asserts she was required to remove her project from the school at the University's request. Plaintiff states the model was damaged when it was disassembled and removed from the school. (Doc. 51 at 5, citing Plaintiff's Depo, at pp. 297-298).

Plaintiff has not attached the relevant portions of her deposition transcript in support of this argument. Therefore, she has failed to submit evidence in support of this argument. In any event, plaintiff fails to explain when she was required to move her project, how badly the project was damaged, what she had to do to remedy the damaged portions, and how the damage affected her ability to finish and present her project. Without these details, the Court is unable to assess the relevance of plaintiff's proffered testimony in meeting her *prima facie* case.

16

December 2007, she failed to show up to present her Senior Studio project. (Pl. Dep. 351-52).

Plaintiff's contention that she was denied feedback is not well-taken.

Even assuming plaintiff presents a *prima facie* case of discrimination, she fails to present

evidence creating a genuine issue of fact that the University's actions were a pretext for

pregnancy discrimination. After plaintiff failed to present her work at the December 3, 2007

scheduled review, the University declined to give plaintiff any further opportunities to present

her work and thus finish her degree. Dr. Karen Faaborg, the Vice Provost for Academic

Personnel, explained:

> Extending further opportunities beyond those you have already missed would be
> unfair to the students who have been held to the deadlines and expectations of the
> faculty, and have found a way to meet them in spite of personal hardships.

(Doc. 46, Pl. Dep. Ex. 31).

To establish this proffered reason is a pretext for discrimination, plaintiff must present

evidence showing that the University's proffered explanation is unworthy of credence or that

defendants were more likely motivated by a discriminatory reason. *Manzer*, 29 F.3d at 1082.[4]

Plaintiff may meet her burden in one of three ways.

First, she may show that the University's proffered reasons had no basis in fact. *Id.* at

1084. Plaintiff must produce evidence showing that the reasons given by the University simply

did not happen, *i.e.*, the reasons are factually false. *Id.*

Second, plaintiff may show that the University's proffered reasons did not actually

motivate the adverse action. *Id.* Plaintiff must present more than "the bare bone elements" of

her *prima facie* case and "introduce additional evidence of . . . discrimination." *Id.* Under these

---

[4]As *Manzer* was an employment discrimination case, the Court has adapted the three bases for establishing
pretext to fit the context of a Title IX discrimination claim.

circumstances, plaintiff must present evidence attacking the credibility of the University's explanation "by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant." *Id*.

Third, plaintiff may show pretext by producing evidence that shows other students, particularly those not in the protected class, did not suffer the same fate even though they engaged in substantially identical conduct to that which the University contends motivated its adverse action. *Id*. *See also Gray*, 263 F.3d at 600-602.

Plaintiff essentially relies on the second *Manzer* basis for showing pretext. In support of her claim that defendants' stated reasons for not awarding plaintiff a degree is a pretext for discrimination, plaintiff reiterates the arguments made in attempting to establish her *prima facie* case. (Doc. 51 at 4). As discussed above, plaintiff may not rely solely on her *prima facie* case to establish pretext, but must introduce additional circumstantial evidence of discrimination making it more likely than not that the University's explanation is a pretext or coverup. *Manzer*, 29 F.3d at 1084. Plaintiff has not done so in this case. Rather than support plaintiff's claim of pretext, plaintiff's academic evaluations and her failure to present a completed project for final review support defendants' legitimate nondiscriminatory reason for its decision not to award plaintiff a degree. Plaintiff has failed to present any evidence showing that but for her pregnancy loss, the University would have given her more opportunities to present her Senior Studio project and complete her degree. Plaintiff has failed to present evidence to rebut the University's legitimate, nondiscriminatory reasons for its actions and fails to raise a genuine a issue of fact requiring resolution by a jury.

Finally, to the extent plaintiff may be contending the University violated the regulations under Title IX by not granting her medical leave following her pregnancy loss, her contention is

18

without merit. *See* 34 C.F.R. § 160.40(b)(5) ("a recipient shall treat pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery therefrom as a justification for a leave of absence for so long a period of time as is deemed medically necessary by the *student's physician. . . .*") (emphasis added). Plaintiff never provided the University with documentation from a physician indicating that she needed medical leave of a specified length of time as a result of her pregnancy loss. (Pl. Dep. 251, 325). In fact, plaintiff admitted that she had not even discussed the issue of medical leave with her health care providers in 2006. (Pl. Dep. 326). The only documentation presented by plaintiff concerned the pregnancy itself, the fact of the miscarriage, and the nurse's note saying plaintiff "needed time to grieve" until May 18, 2006. (Pl. Dep. 251-53; Ex. 18).[5] Therefore, plaintiff has no viable claim for a violation of the Title IX regulations.

In sum, plaintiff has failed to present evidence establishing her *prima facie* case of discrimination under Title IX. Nor has she presented evidence showing the University's proffered reason for not awarding her a degree is a pretext for discrimination. Accordingly, defendants' motion for summary judgment should be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1. Defendants' motion for summary judgment (Doc. 46) be **GRANTED**.

2. The Court certify pursuant to 28 U.S.C. § 1915(a) that for the foregoing reasons an appeal of this Order would not be taken in good faith and therefore deny plaintiff leave to appeal *in forma pauperis*. Plaintiff remains free to apply to proceed *in forma pauperis* in the Court of Appeals.

---

[5]In contrast, plaintiff did provide the University with a physician's written recommendation of bedrest in connection with her 2004 pregnancy and the University granted plaintiff more time to complete her Senior Studio work. (Pl. Dep. 142-43).

*See Callihan v. Schneider*, 178 F.3d 800, 803 (6th Cir. 1999), overruling in part *Floyd v. United States Postal Serv.,* 105 F.3d 274, 277 (6th Cir. 1997).

Date: 9/28/10

Timothy S. Hogan
United States Magistrate Judge

20

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CYNTHIA MCCONAUGHY,                    Case No. 1:08-cv-320
    Plaintiff                              Weber, J.
                                       Hogan, M.J.

  vs

UNIVERSITY OF CINCINNATI, et al.,
    Defendant

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

21