UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CYNTHIA McCONAUGHY,

        Plaintiff

      v.                      Case No. 1:08-cv-320-HJW

UNIVERSITY OF CINCINNATI, et al,

        Defendants

## ORDER

This matter is before the Court upon the defendants' motion for summary judgment (doc. no. 46) and the Magistrate Judge's Report and Recommendation (doc. no. 55). Plaintiff, through counsel, filed a brief in opposition, but is now proceeding *pro se*.[1] On March 25, 2011, this Court held a hearing at which the parties presented oral arguments. Plaintiff has been given numerous extensions of time since October of 2010, but to date, has not filed any specific written objections to the Report and Recommendation. Instead, plaintiff submitted various exhibits without any accompanying explanation (doc. no. 94). Having carefully considered the entire record, the Court will <u>adopt</u> the Report and Recommendation and <u>grant</u> the defendants' motion for summary judgment for the following reasons:

## I.  Background and Factual Allegations

On May 7, 2008, plaintiff filed this action against the University of Cincinnati

---

[1]Counsel (Bradley Braun and Lisa Wenzel) entered appearances for plaintiff on July 8, 2009, and later withdrew, respectively, on September 28, 2010 and December 2, 2010.

("University"), the College of Design Architecture Art and Planning ("DAAP"), the School of Architecture and Interior Design, Professor Henry Hilderbrandt, and University Ombudsman Lillian Santa Maria (doc. no. 1).[2]  In her complaint, plaintiff claimed the defendants denied her "pregnancy leave" and "subjected [her] to undue retaliation," thereby "causing [her] to forfeit her opportunity to graduate from the DAAP/SAID program . . . in violation of her civil rights, in particular, Title IX subpart B, 106.40" (doc. no. 5 at 1).   The complaint also claims that Professor Hilderbrandt retaliated against her "after learning of her miscarriage" (¶¶ 45-54) and that the University Ombudsman was negligent in advising plaintiff (¶ 55). The complaint indicates plaintiff "believes the defendants are denying her an education because of her pregnancy, and because [she] no longer fits-in with the self-imploded pretentiousness of the DAAP program" (doc. no. 5 at ¶ 18).

Plaintiff seeks: 1) an injunction against the defendants to enjoin them from "further unlawful conduct";  2) reinstatement as a student at the University (under a variety of conditions desired by plaintiff, including waiver of the minimum 2.0 grade requirement for graduation, removal of any references to her suspension and her repeated status on academic probation, and an "unbiased" advisor to critique her senior project); 3) lost wages, pay, and benefits;  4) compensatory damages; 5) punitive damages;  6) pre-judgment interest;  7) attorney fees; and  8) any other

---

[2]The University correctly points out that its College of Design, Architecture, Art and Planning ("DAAP") and School of Architecture and Interior Design ("SAID") have no separate legal identity apart from the University.  For the sake of brevity, the Court will refer to them collectively as the University.

available relief.

 After discovery concluded, the defendants moved for summary judgment (doc. no. 46) and submitted "Proposed Findings of Fact" based largely upon the plaintiff's own deposition testimony (doc. nos. 47, 88). The following facts are taken verbatim from the "Defendant's Proposed Findings of Facts." Any disagreement expressed by plaintiff in her highlighted version or at the hearing will be discussed hereinafter.

 1. Plaintiff Cynthia McConaughy first enrolled at the University of Cincinnati ("the University") in 1983. (Pl. Dep. 56)

 2. In 1998, McConaughy entered the University's College of Design, Architecture, Art, and Planning ("DAAP"). (Pl. Dep. 85)

 3. DAAP is well-known to be one of the most challenging programs of study at the University and one of the most competitive design programs in the country. (Compl., Doc. 5, ¶¶ 2-3)

 4. Throughout her academic career at the University, McConaughy had poor attendance in class and struggled with numerous courses. (See, e.g., Pl. Dep. 367)

 5. When one of her DAAP projects received a mid-term grade of C-minus, McConaughy testified: "I was happy with that." (Pl. Dep. 129)

 6. McConaughy often withdrew from classes and also failed several classes. (Pl. Dep. 92-95)

 7. Nevertheless, the University allowed her to continue in the DAAP program.

 8. The DAAP curriculum culminates with a Senior Studio course in which interior design students are required to prepare and present a final design project.

9. At mid-term and again at finals, students are required to "pin up" their project for critique by members of DAAP's faculty. (Pl. Dep. 147)

10. The project includes a model, various drawings and elevations, a site plan, an image board, and other components. (Pl. Dep. 294-95)

11. Despite having started in the DAAP program in 1998, McConaughy took the Senior Studio course for the first time in the Spring quarter 2003-04. (Pl. Dep. 109)

12. At that time, the course was taught by Defendant Henry Hilderbrandt and Professor Ann Black. (Pl. Dep. Ex. 6)

13. Students' grades in Senior Studio are based not just on what the students produce, but on the overall process and "how they develop their work throughout the quarter." (Hilderbrandt Dep. 33)

14. In a May 24, 2004 letter, Hilderbrandt and Black advised McConaughy that her project was "not up to the level of development and resolution as it should be at this time in the quarter." (Pl. Dep. Ex. 6)

15. Based on their understanding that McConaughy's doctor was ordering her to remain on bedrest, the letter said that McConaughy could complete her Senior Studio work "by the last class day of Summer Quarter, Friday, August 27, 2004, unless a medical condition warrants a different end date," so that she could focus on her health. (Pl. Dep. Ex. 6)

16. Despite this situation, McConaughy participated in the University's graduation ceremony and attended a graduation party at a bar in Mt. Adams. (Pl. Dep. 145-46)

17. Ultimately, the University did not hold McConaughy to the August 2004 extension date. (Pl. Dep. 112)

18. McConaughy then planned to take until the Spring 2005 quarter to complete her Senior Studio project. (Pl. Dep. 113)

19. In November 2004, McConaughy contacted Professor Black about completing her graduation requirements; McConaughy had not yet finished her Senior Studio project at that point. (Pl. Dep. 154-56)

20. Professor Black responded in an e-mail to McConaughy and Hilderbrandt that McConaughy "can work on her project over the break and present the final project early in January [2005]." (Pl. Dep. Ex. 8)

21. Among other assistance, Professor Black also sent an e-mail to the Hamilton County Department of Job and Family Services to help McConaughy arrange childcare so that she could focus on her course work. (Id.; Pl. Dep. 111, 157)

22. However, McConaughy did not complete the project for review in January 2005 as discussed with Professor Black. (Pl. Dep. 155-56)

23. Instead, McConaughy unilaterally decided that she would just take the Senior Studio course "the next time around in '05." (Pl. Dep. 155-56)

24. McConaughy failed to take advantage of the extension that Professor Black offered for the Senior Studio project because McConaughy did not consider those arrangements to be sufficiently "formal." (Pl. Dep. 155)

25. During the Spring quarter in 2005, after McConaughy had apparently continued to work on her Senior Studio project, McConaughy and Professor Black

agreed that McConaughy would present her project on May 16, 2005 – some four months after the January 2005 extension that Professor Black had previously given McConaughy. (Pl. Dep. Ex. 9)

26. But at 5:56 a.m. on the agreed-upon date, McConaughy sent an e-mail to Professor Black admitting that her project was still "not all the way finished" and that her project was "still under-developed in comparison to those in Sr. Studio at this time." (Pl. Dep. Ex. 9)

27. McConaughy went on to note in her e-mail that, even had she completed the work that should have been done months before, she would not have presented it anyway because her car was in the shop. (Pl. Dep. Ex. 9; Pl. Dep. 181-82)

28. McConaughy withdrew from the Senior Studio course that quarter. (Pl. Dep. 94)

29. In July 2005, McConaughy went on academic probation due to her bad grades. (Pl. Dep. Ex. 10)

30. It was the second time the University had placed her on probation. (Pl. Dep. Ex. 10)

31. After withdrawing from Senior Studio, McConaughy met with another DAAP professor, Patrick Snadon. (Pl. Dep. 94, 191; Ex. 11 at 2-3)

32. Professor Snadon also offered McConaughy still more time to finish her Senior Studio project and present it during the summer of 2005. (Pl. Dep. Ex. 11 at 2-3)

33. After agreeing to take advantage of these extraordinary arrangements,

McConaughy once again failed to follow through and finish her course work. McConaughy did not even contact Professor Snadon again until November 2005. (Pl. Dep. Ex. 11 at 2-3)

34. In a November 10, 2005 e-mail, McConaughy apologized to Professor Snadon for her failure to complete the project even with the additional extension he had provided her: I am sincerely grateful to you for provided [sic] me the opportunity to finish my degree this summer. Although I anticipated meeting the requirements you outlined, I deeply regret that I was unable to finish. (Pl. Dep. Ex. 11 at 2)

35. McConaughy referred to childcare problems that she had supposedly resolved, and she asked for a "final opportunity" – acknowledging her understanding that "no other opportunities will be granted" to her. (Pl. Dep. Ex. 11 at 3)

36. In December 2005, Ann Black and others from the DAAP faculty met with McConaughy yet again to see how she might be able to finish her degree. (Pl. Dep. 199; Ex. 11)

37. The University allowed her to enroll in the Senior Studio course for a third time, even assisting with financial arrangements for her to take that course and one other she needed for graduation. (Pl. Dep. 206, 208, 222-23; Ex. 14)

38. McConaughy's instructors felt that she performed poorly in Senior Studio through the first seven weeks of the course; she received a grade of D on her third week review and a D+ for her fifth week review. (Pl. Dep. 224; Ex. 16)

39. In a March 3, 2006 e-mail to Professor Black, McConaughy acknowledged that her Senior Studio project "is simply not at all where it needs to be." (Pl. Dep. Ex.

14)

40. Consistent with McConaughy's own self-analysis, her professors' evaluation the following month was that McConaughy's work was "confusing" and "incomplete as is." (Pl. Dep. Ex. 16)

41. On May 10, 2006, McConaughy – still on academic probation – was scheduled to present her work at the seventh-week final design review. (Pl. Dep. 233)

42. At that time, McConaughy experienced a miscarriage. (Pl. Dep. 233)

43. McConaughy had never disclosed her pregnancy to the University. (Pl. Dep. 218-19)

44. Even before the miscarriage, McConaughy's progress in her Senior Studio work was even worse than it had been during her unsuccessful 2004 attempt to finish the class. (Pl. Dep. 219-20)

45. On May 19, 2006, a nurse sent the University a note asking that McConaughy's absence from classes between May 6 and May 18 be excused because McConaughy "needed time to grieve" during that period. (Pl. Dep. Ex. 18)

46. Two days prior to the date on that nurse's note, McConaughy's professors had sent her a letter about her status in Senior Studio. (Pl. Dep. Ex. 17)

47. The professors expressed concern about the work that remained to be done on the project at McConaughy's last review, problems with her graphic communications work, and her poor attendance in the course. (Pl. Dep. Ex. 17)

48. They advised her to make an appointment with Michaele Pride-Wells, Director of the Interior Design Program, and Professor Black regarding

McConaughy's future at the University. (Pl. Dep. Ex. 17)

49. After meeting with Professor Black, McConaughy was given more time – until June 5, 2006 – to present her Senior Studio project. (Pl. Dep. 257-58)

50. Although she had loaded the project in her car, she chose not to present her work for review that day. (Id. at 258; Ex. 22)

51. Several hours later, McConaughy's professors told her she would be receiving an F for the Senior Studio course. (Pl. Dep. Ex. 22)

52. The next morning, however, the same professors agreed to give McConaughy one more chance. (Pl. Dep. Ex. 21)

53. Defendant Hildebrandt sent her an e-mail stating that he and Professor Kristie Pudlock would submit an "Incomplete" grade for McConaughy and would give her until June 19 to present her Senior Studio project. (Pl. Dep. Ex. 21)

54. McConaughy responded to express her appreciation for the additional time: "Thank you for changing your mind." (Pl. Dep. Ex. 21)

55. When the agreed-upon June 19 date came, McConaughy presented work that she acknowledges was not even finished. (Pl. Dep. 261; Ex. 21, 23)

56. While her professors concluded that she had earned an F for the Senior Studio course, they nonetheless encouraged her to complete the project with the intention of presenting it "for a pin up review in the near future after the work is finished." (Pl. Dep. Ex. 23)

57. Michaele Pride-Wells, Director of the Interior Design Program, also encouraged McConaughy in June 2006 to finish the project and request a review

when it was completed. (Pl. Dep. 264-65)

58. Yet McConaughy waited until November 2006 to contact Pride-Wells. (Pl. Dep. Ex. 28 at 1-2)

59. In an e-mail to Pride-Wells, McConaughy expressed "remorse . . . for failing to finish my degree," and she asked: "May I please show you that I can still produce quality work similar to what I was capable of producing prior to my Senior Year?" (Pl. Dep. Ex. 28 at 2)

60. The May 2006 miscarriage was but one item McConaughy mentioned among a host of other "life-altering circumstances" that she listed for Pride-Wells to explain the situation McConaughy had created for herself at the University. (Pl. Dep. Ex. 28 at 2)

61. Even as of November 2006, however, McConaughy had not finished her Senior Studio project. (Pl. Dep. 293)

62. In response, Pride-Wells advised McConaughy to contact Dean Amberly Miller for further assistance. (Pl. Dep. Ex. 28 at 1)

63. McConaughy spoke with Dean Miller about the suspension, effective September 2006, that the University issued McConaughy based on her grades. (Pl. Dep. Ex. 24, 25)

64. Despite being under suspension, McConaughy never applied for readmission. (Pl. Dep. 287-88)

65. Rather than applying for readmission or finally finishing her Senior Studio project at that point, McConaughy instead waited several more months and then

hired a lawyer to file a grievance with the University. (Pl. Dep. 240; Ex. 19)

66. The grievance asked "to have the probation and suspension removed" so that McConaughy could obtain more chances like the many opportunities she had already squandered. (Pl. Dep. Ex. 19)

67. McConaughy also requested that the University use an external reviewer to evaluate her Senior Studio project. (Pl. Dep. 346)

68. The University had its Provost, Dr. Karen Faaborg, investigate the grievance and meet with McConaughy and her attorney. (Pl. Dep. Ex. 29)

69. Dr. Faaborg ultimately concluded that McConaughy had never requested a medical leave. In a letter dated July 30, 2007, Dr. Faaborg wrote:  The College did have a request from you for an extension on the time period for presentation of the Senior Project which they honored. But at no time did you indicate to them that a medical leave was needed. (Pl. Dep. Ex. 29)

70. McConaughy understood her own responsibility to provide the University with information about her condition. (Pl. Dep. 250)

71. Nonetheless, McConaughy had not provided the University with documentation about how much time she needed to take after the miscarriage. (Pl. Dep. 251)

72. McConaughy herself had not even discussed this issue with her health care providers in 2006. (Pl. Dep. 326)

73. All she submitted in 2006 was documentation about the pregnancy itself, the fact of the miscarriage, and the nurse's note saying McConaughy had "needed

time to grieve" only through May 18, 2006. (Pl. Dep. 251-53; Ex. 18)

74. By contrast, in connection with McConaughy's 2004 pregnancy, she had provided Professor Ann Black with a doctor's written recommendation of bedrest when the University granted her more time to complete her Senior Studio work. (Pl. Dep. 142-43)

75. McConaughy herself refers to that 2004 situation as having set a "precedent." (Pl. Dep. 254)

76. Just as in 2004, the University in 2006 agreed to give McConaughy a series of extensions following the miscarriage.

77. And after McConaughy's lawyer filed the 2007 grievance, the University agreed to provide McConaughy with still more time in addition to the multiple extensions already offered; Dr. Faaborg's July 2007 letter responding to the grievance offered McConaughy yet another opportunity to present her Senior Studio project. (Pl. Dep. 326-27; Ex. 29)

78. McConaughy then had from July to December to complete her project.

79. The University advised her that she could use the University's library and Computer Graphics Center to do the work. (Pl. Dep. Ex. 31 at 2)

80. McConaughy also had access to the work she had previously completed and stored on the University's server. (Pl. Dep. Ex. 31 at 2)

81. From five dates that were offered to her, McConaughy chose to present her project on December 3, 2007. (Pl. Dep. 346-47; Ex. 31 at 1-2)

82. In satisfaction of McConaughy's request for an external reviewer, the

University arranged for John Weigand, Chair and Professor of Architecture and Interior Design at Miami University, to evaluate the project. (Pl. Dep. 346-47; Ex. 31 at 1-2)

83. The University told McConaughy that Professor Hildebrandt agreed to accept whatever grade was awarded by Dr. Weigand. (Pl. Dep. 346-47; Ex. 31 at 1-2)

84. Despite all these arrangements by the University, McConaughy did not show up to present her Senior Studio project on the designated date. (Pl. Dep. 351)

85. Dr. Weigand, as well as McConaughy's own attorney, made the unnecessary trip to DAAP. (Pl. Dep. 353; Ex. 31)

86. McConaughy failed to appear because her project did not fit into the rental car she was driving and she began to panic. (Pl. Dep. 352)

87. On December 12, 2007, Dr. Faaborg wrote an e-mail to McConaughy stating that the University could provide no further opportunities for McConaughy to finish the Senior Studio course. (Pl. Dep. Ex. 31)

88. Dr. Faaborg included contact information in the e-mail for the University's Center for Exploratory Studies so that McConaughy could determine whether she was eligible for another degree based on her previous course work. (Pl. Dep. Ex. 31)

89. Rather than following up with Dr. Faaborg or investigating available options for other degrees from the University, McConaughy instead chose to file this lawsuit. (Pl. Dep. 355).

*   *   *   *   *   *   *   *

In response, plaintiff, through counsel, filed a brief in opposition (doc. no. 51).

Page 13 of 24

On September 28, 2010, the Magistrate Judge entered a detailed Report and Recommendation, recommending that the defendants' motion for summary judgment be granted. Objections were due by October 15, 2010 (doc. no. 55). Plaintiff sought (and was granted) numerous extensions of time (doc. nos. 56, 57, 75, 80, 81, 90, 91), but never filed any objections to the Report and Recommendation. On March 14, 2010, plaintiff submitted numerous exhibits with a "Motion to Admit Plaintiff's Evidence to Object to Magistrate's Report and Recommendation," but did not articulate any specific objections (doc. no. 94). On March 14, 2010, plaintiff also moved for leave to fie a high-lighted version of defendant's "Proposed Findings of Facts" (doc. no. 95). This Court granted the motion (doc. no. 98).

## II. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

Amended Rule 56(c)(1) further provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed.R.Civ.P. 56(c)(1).

The Committee Notes explain that the "standard for granting summary judgment remain unchanged" and that amendment "will not affect continuing development of the decisional law construing and applying" the standard. Fed.R.Civ.P. 56, Committee Notes at 31. Under Rule 56, the moving party bears the burden of proving that no genuine issue of material fact exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (l986). The district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. Id. at 587. In reviewing a motion for summary judgment, a court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

## III.  Analysis

### A. Relevant Law

Plaintiff has alleged "pregnancy" discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX"), which provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

See also, North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 530-40 (1982) (observing that Title IX "proscribes gender discrimination in education programs or facilities

receiving federal financial assistance" against its employees and students). Federal regulations provide that "a recipient shall not discriminate against any student . . .on the basis of such student's pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery therefrom . . ." 34 C.F.R. § 106.40.

Title IX discrimination claims by students against a university are analyzed under the same burden-shifting framework used in Title VII cases.  See, e.g., Ivan v. Kent State Univ., 1996 WL 422496, at *2 (6th Cir. July 26, 1996);  Yusuf v. Vassar College, 35 F.3d 709, 715 (2nd Cir. 1994) ("courts have interpreted Title IX by looking to the . . . the case law interpreting Title VII");  Preston v. Commonwealth of Virginia ex rel. New River Community College, 31 F.3d 203, 206-207 (4th Cir. 1994) ("most courts that have addressed the question have indicated that Title VII principles should be applied to Title IX").

To establish a prima facie violation of Title IX, plaintiff must show by a preponderance of the evidence that: (1) she was a member of a protected class; (2) she was performing the academic requirements at a level sufficient to meet her educator's legitimate expectations; (3) she suffered adverse treatment; and (4) the educational program continued to instruct and credit other students. See Darian v. University of Massachusetts, 890 F. Supp. 77, 91 (D.Mass. 1997)(citing Lipsett v. University of Puerto Rico, 864 F.2d 881, 897 (1st Cir. 1988)).

If plaintiff meets this burden, the burden then shifts to defendants to articulate a legitimate non-discriminatory reason for its adverse treatment. McDonnel Douglas Corp. V. Green, 411 U.S. 792, 804 (1973).  If defendant does so, the burden of

production shifts back to plaintiff to demonstrate that the defendants' articulated reason is a pretext for discrimination. Id.

B. Discussion

On March 25, 2011, this Court held a hearing on the motion for summary judgment and the Report and Recommendation. The Court questioned the parties at length regarding the disputed facts (as indicated in the high-lighted portions) in the plaintiff's "Highlighted Response to Defendant's Proposed Findings of Facts" (doc. no. 95-1, 99).[3] When asked about the basis for why she was disputing numerous details in the defendant's "Proposed Findings of Fact," plaintiff admitted that she had no basis to dispute many of the sections she had high-lighted in red as "contested" and that she had disputed some facts merely because she "didn't trust" the defendants or "didn't know what they meant."

Although plaintiff had high-lighted as "disputed" various isolated words or phrases (such as the terms: "give, agreed, the instant, designated, often, several, prepare, components, extension, advised, in, note, work, until, and lawyer"), she did not coherently explain the basis for contesting them, and generally conceded at the hearing that she had no basis to do so. At times, plaintiff made unsupported assertions regarding factual details that contradicted her own deposition testimony. Although pro se plaintiffs are afforded liberal treatment, the leniency standard

_____

[3]In her high-lighted version of the proposed facts, plaintiff omits without explanation various numbered paragraphs (i.e. ¶¶ 4, 5, 7), which results in a discrepancy in the numbering between the defendant's original document and plaintiff's version.

granted to pro se litigants is not boundless.  Martin v. Overton, 391 F.3d 710, 714 (6th Cir. 2004).

Having considered the briefs, oral arguments, and the evidence of record, the Court concludes that the plaintiff has not established a prima facie case of Title IX discrimination at the second step.  Prior to her 2006 miscarriage, McConaughy was not meeting the legitimate expectations of the University with respect to her performance in Senior Studio. She received grades of D and D+ during mid-term evaluations, and her professors indicated that her drawings were "confusing" and "incomplete." (Pl. Dep. Ex. 16).  Prior to her 2006 miscarriage, plaintiff's professors indicated that her project was "underdeveloped for that phase" (Pl. Dep. 394) and plaintiff acknowledges that her project was unfinished at that time.  Her protestation at the hearing that such projects "are never finished" is unavailing.  The plaintiff cannot rest upon conclusory allegations, improbable inferences, and unsupported speculation.  Although pro se pleadings are liberally construed, Boag v. MacDougall, 454 U.S. 364, 365 (1982) (per curiam), pro se plaintiffs "are not automatically entitled to take every case to trial."  Pilgrim v. Littlefield, 92 F.3d 413, 416 (6th Cir. 1996).

As the Magistrate Judge correctly pointed out in the Report and Recommendation, plaintiff's Title IX claim relates only to the termination of her pregnancy because she admittedly did not tell anyone at the University about the pregnancy until the miscarriage occurred in May of 2006 (Pl. Dep. 219, 331-32).  Plaintiff's complaint specifically alleges only discrimination "following" her miscarriage (doc. no. 5 at 1).  It is undisputed that the University did not even know

plaintiff had been  pregnant at that time.  In the year following her 2006 miscarriage, McConaughy continued to fail to meet the University's expectation that she actually finish her Senior Studio project within the generous extensions of time repeatedly given her.

Even assuming *arguendo* that plaintiff had established a prima facie case, she has also not shown that the University's legitimate, non-discriminatory reasons for its actions (i.e. not providing further extensions after plaintiff failed to show up for the independent review) were pretextual in any way.  Although plaintiff claims she was discriminated against because of her pregnancy, the evidence of record shows that the University gave her repeated opportunities and substantial extensions of time in which to complete her course work, as well as other assistance, including financial assistance.  Plaintiff has given a litany of excuses for not availing herself of such opportunities, such as car trouble, "panic," or merely that she unilaterally decided to do her project at a later time (while unreasonably assuming she could demand further extensions).  Plaintiff points to no similarly situated individuals, i.e. anyone who was given as many time extensions and other forms of assistance as plaintiff.

The University aptly points out that "McConaughy can present no evidence that the University's reasons not to give her endless additional chances to complete the required Senior Studio project, after she had already wasted much time and many resources, were a pretext for pregnancy discrimination" (doc. no. 88 at ¶ 113). Title IX does not prohibit the University from failing a (formerly) pregnant student

who produces incomplete or substandard work after numerous extensions. Indeed, the United States Supreme Court has observed that universities have "legitimate educational reasons for expecting all students . . . . to complete all course requirements, clinical and classroom . . .[t]his type of purpose, far from reflecting any [discriminatory] animus . . . ., is shared by many if not most of the institutions that train persons to render professional service." Southeastern Community College v. Davis, 442 U.S. 397, 413 (1979).

Additionally, plaintiff cites 34 C.F.R. § 160.40(b)(5), which provides in relevant part that "a recipient shall treat . . . termination of pregnancy and recovery therefrom as a justification for a leave of absence for so long a period of time as is deemed medically necessary by the student's physician, at the conclusion of which the student shall be reinstated to the status which she held when the leave began."

Defendants point out that this regulation does not create a separate cause of action apart from Title IX.  See Henschke v. New York Hospital-Cornell Medical Center, 821 F. Supp. 166, 173 (S.D.N.Y. 1993) (noting that plaintiff has not shown that "separate causes of action exist under both Title IX and [34 C.F.R. § 160.40 of] the regulations").  In any event, the Court need not resolve such question because the defendants correctly point out that plaintiff failed to satisfy the facial requirements of this regulation.  Plaintiff never provided the University with a physician's opinion regarding how much time was "medically necessary" after her miscarriage.  Indeed, plaintiff admits she does not know her physicians' views on this matter because she never discussed it with them (Pl. Dep. 326). Plaintiff merely provided the University

with a note from a nurse who indicated that McConaughy "needed time to grieve" from May 6, 2006 until May 18, 2006. (Pl. Dep. 325-26; Ex. 18).

Moreover, the extensions of time given to plaintiff by the University far exceeded the time period suggested by the nurse's note.  No evidence of record indicates that the University ignored any physician's opinion as to "medical necessity." Plaintiff's assertion that she could make the determination about medical necessity on her own is unavailing, as plaintiff may not serve as her own doctor for purposes of the regulation (Pl. Dep. 317-18).  Although plaintiff testified twice that six weeks was a reasonable amount of time (Pl. Dep. 233, 325-26), her  Senior Studio project  remained unfinished by November 2006 (six months after the miscarriage) (Pl. Dep. 293).  The University responded to plaintiff's 2007 grievance by giving her yet another opportunity to present her Senior Studio project.  However, plaintiff failed to show up for the independent review arranged at plaintiff's request by the University.[4]

To the extent plaintiff makes the unsupported claim that Professor Hildebrandt (see doc. no. 5 at ¶¶ 45-54) "retaliated" against her, any such claims are also subject to dismissal because individual defendants are not liable under Title IX.  See <u>Soper v. Hoben</u>, 195 F.3d 845, 854 (6th Cir. 1999) (explaining that "only recipients of federal funds may be liable for damages under Title IX" and affirming the district court

---

[4]The Magistrate Judge has carefully and extensively set forth the facts regarding the various time extensions and other assistance given to plaintiff.  The Court's decision expressly incorporates the "Report and Recommendation" and need not repetitively recite the myriad details of plaintiff's student career here.

dismissal of Title IX claim against defendants in their individual capacities).

To the extent plaintiff alleges the University's Ombudsman Lillian Santa-Maria in her official capacity was "negligent" for not informing plaintiff about medical leave and was ineffective in advising her (doc. no. 5 at ¶ 55), the Eleventh Amendment to the United States Constitution bars plaintiff from bringing a state law negligence claim against a state university in federal court. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 117 (1984) (holding that "[i]t is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment"); Nuovo v. The Ohio State University, 726 F.Supp.2d 829, 850 (S.D.Ohio 2010) ( holding that a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment).

Defendants point out that McConaughy also cannot pursue her state law claims against Ombudsman Santa-Maria in her individual capacity because she is entitled to immunity from suits under state law. Ohio Rev. Code § 9.86 provides that "[e]xcept for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner."

In considering this statute, the Court of Appeals for the Sixth Circuit has explained that "Ohio law requires that, as a condition precedent to asserting a cause of action against a state employee in his individual capacity, the Court of Claims must first determine that the employee is not entitled to immunity provided for in Revised Code § 9.86." Haynes v. Marshall, 887 F.2d 700, 705 (6th Cir. 1989). The Court concluded that "[p]rior to that condition being satisfied, then, there is no claim under Ohio law upon which relief may be granted against state employees in their individual capacities." Id. Therefore, plaintiff's negligence claim must be dismissed. See, e.g., Alexander v. Ohio State University College of Social Work, 2008 WL 4823081 (S.D.Ohio) (dismissing plaintiff's state law claims for failure to comply with O.R.C. § 9.86); Kingsley v. Brundige, Slip Copy, 2011 WL 1043924 (S.D.Ohio) (same).

IV. Conclusion

The undisputed facts show that plaintiff did not complete the Senior Studio course which is a prerequisite for graduation from the University's College of Design, Architecture, Art and Planning program. At the time of her miscarriage in 2006, plaintiff had already fallen behind in her Senior Studio work and was receiving poor grades. The University was unaware of plaintiff's pregnancy until plaintiff notified the University by means of a nurse's note indicating that plaintiff she needed several weeks to grieve her miscarriage. The University then gave plaintiff generous extensions of time and numerous additional opportunities to finish her Senior project. However, plaintiff repeatedly failed to follow through and avail herself of the many opportunities offered by the University. In conclusion, defendants have shown

that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).

Accordingly, the Court rules as follows:

1)      plaintiff's "Motion to Admit Materials" (doc. no. 93) is GRANTED;

2)      plaintiff's "Motion to Admit Plaintiff's Evidence to Object to Magistrate's Report and Recommendation" (doc. no. 94) is GRANTED;

3)      the Report and Recommendation (doc. no. 55) is ADOPTED;

4)      the defendants' motion for summary judgment (doc. no. 46) is GRANTED.

This case is DISMISSED and TERMINATED on the docket of this Court.

IT IS SO ORDERED.

                                                        s/Herman J. Weber
                                           Herman J. Weber, Senior Judge
                                           United States District Court